# EXHIBIT B

## COMMONWEALTH OF MASSACHUSETTS

**SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
DOCKET # BRCV2005 – 00182-C**

**Dennis Audette
on Behalf of himself
And All Others Similarly Situated,**

          **Plaintiff,**

**vs.**

**HEBEI WELCOME PHARMACEUTICAL CO. LTD.;
JIANGSU JIANGSHAN PHARMACEUTICAL CO. LTD.;
NORTHEAST PHARMACEUTICAL GROUP CO. LTD;
WEISHENG PHARMACEUTICAL CO. LTD.;
SHIJIAZHUANG PHARMACEUTICAL (USA) CO. LTD.;
CHINA PHARMACEUTICAL GROUP, LTD.**

          **Defendants.**

---

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, through his attorneys, brings this civil action on behalf of himself and all others similarly situated in Massachusetts, for damages and declaratory relief under the antitrust laws of Massachusetts, against the above named Defendants. Plaintiff, upon personal knowledge as to his own actions and upon information and belief with respect to all other allegations, respectfully alleges the following:

## INTRODUCTION

1.    This case arises out of a long-running conspiracy beginning no later than

December 2001, and continuing until present, among Defendants and their Co-Conspirators with the purpose and effect of fixing prices, creating supply restraints, allocating market share, and committing other unlawful practices designed to inflate the prices of Vitamin C and products containing Vitamin C sold indirectly to Plaintiff and other purchasers in Massachusetts.

    2.    Defendants' conspiracy has involved illegal conduct by an international cartel that has deliberately targeted, and severely burdened, consumers in Massachusetts. The conspiracy has existed at least during the period from December 2001 to the present, and has affected millions of dollars of commerce for products commonly found in households in the United States, including Massachusetts, raising the costs of those products to Plaintiff and Massachusetts consumers in general.

    3.    The actions described herein consist of continuing agreements, understandings, and concerts of actions among Defendants and their Co-Conspirators. Pursuant to these agreements and understandings, Defendants acted to fix, stabilize, and maintain the price and control the supply of Vitamin C and products containing Vitamin

    4.    The acts in furtherance of the conspiracy by Defendants and their Co-Conspirators have included, upon information and belief, the following wrongful conduct and horizontal agreements:

        a. Participating in meetings and conversations in which Defendants and their Co-Conspirators discussed and agreed to the prices at which Vitamin C should be sold; and

        b. Participating in meetings and conversations in which Defendants and their Co-Conspirators discussed and agreed to restrict their exports of Vitamin C in order to create a shortage of supply in the market.

## JURISDICTION AND VENUE

5.      This class action seeks nominal statutory damages from the Defendants'
under M.G.L. c. 93A, as a remedy for Defendants' unfair and deceptive practices and
actions against consumers, specifically, the artificial and illegal restraint of the price of
Vitamin C and derivative products sold to consumers in Massachusetts.

6.      The jurisdiction of this Court is based on M.G.L. c. 93A and
Mass.R.Civ.P.23.

7.      Venue in this Court is proper under M.G.L. c. 93A, because many of
Defendants' unlawful acts and a substantial portion of the affected interstate trade and
commerce has been carried out in the Commonwealth of Massachusetts.

8.      Jurisdiction over all Defendants comports with the United States
Constitution, the Courts of the Commonwealth of Massachusetts and M.G.L. c. 93A, as
all Defendants transact business in the Commonwealth of Massachusetts.

9.      Without limiting the generality of the foregoing, the torts and wrongs
alleged herein were committed within the jurisdiction of this Court and the Defendants
wrongful activities were directed into this jurisdiction by or on their behalf.

10.     Further, Defendants (directly or through agents who were at the time
acting with actual and/or apparent authority and within the scope of such authority) have,
upon information and belief:

      a.   transacted business in Massachusetts;

      b.   contracted to supply or obtain services or goods in Massachusetts;

      c.   intentionally availed themselves to the benefits of doing business in
         Massachusetts;

3

d.  produced, promoted, sold, marketed, and/or distributed their products or
    service in Massachusetts and, thereby, have purposefully profited from
    their access to markets in Massachusetts;

e.  caused tortious damage by act or omission in Massachusetts;

f.  caused tortious damage in Massachusetts by acts or omissions committed
    outside such jurisdiction while (i) regularly doing or soliciting business in
    such jurisdiction, and/or (ii) engaging in other persistent courses of
    conduct within such jurisdiction, and/or (iii) deriving substantial revenue
    from goods used or consumed or services rendered in such jurisdiction;

g.  committed acts and omissions which Defendants knew or should have
    known would cause damage (and, in fact, did cause damage) in
    Massachusetts to Plaintiff and members of the Class while (i) regularly
    doing or soliciting business in such jurisdiction, and/or (ii) engaging in
    other persistent courses of conduct within such jurisdiction, and/or (iii)
    deriving substantial revenue from goods used or consumed or services
    rendered in such jurisdiction;

h.  otherwise had the requisite minimum contacts with Massachusetts such
    that, under the circumstances, it is fair and reasonable to require
    Defendants to come to this Court to defend this action.

11.    Plaintiff is a resident of Bristol County in the Commonwealth of

Massachusetts.  In addition, a substantial part of the unfair and deceptive trade and

commerce, as well as the arrangement, contract, agreement, trust, combination,

conspiracy, unfair or deceptive practices, and/or unfair and deceptive uniform and

common course of conduct giving rise to Plaintiff's claims, occurred within

Massachusetts, including, among other things, the indirect sale of Vitamin C and

products containing Vitamin C to Plaintiff and other members of the Class at supra-

competitive prices

12.    As a result of the distribution and sale of their products to consumers in

4

the state of Massachusetts, directly or through their subsidiaries, affiliates or agents, Defendants obtained the benefits of the laws of Massachusetts and the Massachusetts market for their products.

13.      Plaintiff seeks and asserts claims only pursuant to Massachusetts state law and expressly disclaims any intent or attempt to state a federal cause of action. Named Plaintiff's individual damages do not exceed seventy-five thousand dollars ($75,000) inclusive of all damages and pro rate fees, and Plaintiff does not seek any form of "common" recovery. Furthermore, Plaintiff expressly disclaims on behalf of each member of the Class, any individual recovery in excess of $75,000.

14.      Plaintiff's state law cause of action is not federally pre-empted. Plaintiff states, and intends to state, causes of action solely under the laws of the State of Massachusetts and specifically denies any attempt to state a cause of action under the laws of the United States of America, including, without limitation, the Sherman Act, 15 U.S.C. § 1 *et seq.*

## PARTIES

### A.      Plaintiff

15.      Plaintiff Dennis Audette is a resident of Bristol County, Massachusetts who has indirectly purchased Vitamin C and/or products containing Vitamin C, manufactured by one or more of the Defendants during the relevant conspiracy period.

### B.      Defendants

16.      Defendant Hebei Welcome Pharmaceutical Co. Ltd. ("Hebei Welcome") is a Chinese corporation with operations in the Hebei province of China. Hebei Welcome is a joint venture between North China Pharmaceutical Holding Co. Ltd., Hong Kong

Sanwei Intl. Co. Ltd. and Hong Kong Jinxian Co. Ltd. Hebei Welcome's main product is Vitamin C in the forms of crystalline, direct compressible, calcium, and sodium salts. Hebei Welcome is registered to do business in the United States at 815 W. Naomi Ave., Arcadia, CA 91007.

17.   Defendant Jiangsu Jiangshan Pharmaceutical Co., Ltd. ("Jiangsu Jiangshan") is a Chinese corporation based in the Jiangsu province of China. Jiangsu Jiangshan was founded in 1990 as a joint venture between Jiangsu Glucose Factory Zhongshan Co. (H.K.), Jiangsu Provincial Medicine & Health Product Import and Export Co. and Expert Assets Ltd.

18.   Defendant Northeast Pharmaceutical (Group) Co. Ltd. ("Northeast Pharmaceutical") is a Chinese corporation based in the Liaoning province of China. Northeast Pharmaceutical is the largest pharmaceutical enterprise in China. It has produced Vitamin C since the early 1990's. In 2003, Northeast Pharmaceutical registered a total export value of $100 million for its Vitamin C products. Shares of Northeast Pharmaceutical are traded on the Shenzen stock exchange.

19.   Defendant Weisheng Pharmaceutical Co. Ltd. ("Weisheng") is a Chinese Corporation based in the Hebei province of China. Weisheng is an affiliate of the major pharmaceutical corporation China Pharmaceutical Group Ltd.

20.   Defendant Shijiazhuang Pharmaceutical (USA), Inc., (Shijiazhuang") is a Chinese corporation based in the Hebei province of China. Shijiazhuang is an affiliate of Weisheng and the major pharmaceutical corporation China Pharmaceutical Group Ltd. Shijiazhuang is registered to do business in California at 5460 N. Peck Road, Suite A, Arcadia, CA 91006.

21.     Defendant China Pharmaceutical Group Ltd. ("China Pharmaceutical") is
a Hong Kong corporation based in the Hebei province of China.  China Pharmaceutical
was renamed from its former corporate name China Pharmaceutical Enterprise and
Investment Corporation Ltd. on May 7, 2003.  The shares of China Pharmaceutical are
traded on the Hong Kong stock exchange.  China Pharmaceutical owns, controls, and
dominates its affiliates Weisheng and Shijiazhuang and through these affiliates is
engaged in the business of manufacturing and selling Vitamin C.  Collectively,
Weisheng, Shijiazhuang and China Pharmaceutical are referred to hereinafter as China
Pharmaceutical.

22.     The acts alleged in this Complaint were, upon information and belief,
authorized, ordered or done by officers, agents, employees, or representatives of each
Defendant while actively engaged in the management of its business or affairs.

## CO-CONSPIRATORS

23.     Various other individuals, partnerships, corporations, organizations, firms,
and associations not yet made defendants in this Complaint (the "Co-Conspirators") and
presently unknown to Plaintiff, participated as Co-Conspirators in the violations alleged
herein, and performed acts and made statements in furtherance of the combination in
restraint of trade and unfair business practices alleged herein.

24.     The true names and capacities, whether individual, corporate, associate,
representative, or otherwise of defendants named herein as DOES 1 through 100 are
unknown to Plaintiff at this time, and are therefore sued by such fictitious names.
Plaintiff will amend this complaint to allege the true names and capacities of DOES 1

7

through 100 when they become known to Plaintiff. Each of DOES 1 through 100 is in some manner legally responsible for the violations of law alleged herein.

25.     The acts charged in this Complaint as having been done by Defendants and the DOE defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of the defendants' business or affairs.

## CLASS ACTION ALLEGATIONS

26.     This action is brought by Plaintiff on behalf of himself, and pursuant to M.G.L. c. 93A, as representative of a class (the "Class"). In particular, Plaintiff asserts that a class action is appropriate under Mass.R.Civ.P.23.

27.     The class is defined as:

> All persons or entities present in Massachusetts who indirectly purchased Vitamin C or products containing Vitamin C manufactured by any Defendant or Co-Conspirator from at least December 2001 to the present. The class of indirect purchasers of these products includes consumers and businesses that have purchased Vitamin C and/or products containing Vitamin C. Excluded from the class are all governmental entities, Defendants and their subsidiaries and affiliates.

28.     Although the exact size of the class is unknown, the total number of class members is in the millions, as virtually all Massachusetts consumers have purchased Vitamin C or products containing Vitamin C. Based upon the nature of the trade and commerce involved, the total number of class members is such that joinder of the claims of all Class members would be impracticable.

29.     Plaintiff's claims are typical of the claims of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no relevant conflicts of interest with other members of the Class and has retained competent counsel

experienced in class action and antitrust litigation.

30. Common questions of law and fact exist, including:

a. whether Defendants have engaged, and have combined with others to engage, in unfair and deceptive conduct which violates M.G.L. c. 93A;

b. whether Defendants' unfair, deceptive and unlawful conduct has caused a legally cognizable injury to the Class by increasing the prices paid by Class members for Vitamin C above what would have prevailed in a competitive market;

c. whether Defendants' unfair, deceptive and unlawful conduct has caused a legally cognizable injury to the Class by invading legally protected rights of Class members in violation of M.G.L. c. 93A;

d. the existence, duration, and illegality of the conduct alleged herein;

e. the nature and extent of damages sustained by the Class and the unfair and deceptive acts of Defendants and the appropriate measure of damages for those injuries;

f. whether the Class is entitled to nominal damages or other relief requested; and

g. whether Defendants actively concealed the violation alleged herein.

These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

31. Class action treatment is a superior method for the fair and efficient adjudication of the controversy described herein. The class action vehicle provides an efficient method for the enforcement of the rights of Plaintiff and class members, and such litigation can be fairly managed. Plaintiff knows of no unusual problems of management and notice.

32. It is desirable for the claims made herein to be consolidated into a single proceeding so as to provide small claimants with a forum in which to seek redress for the

violations of Massachusetts law.

33.    The difficulties that may exist in the management of the class action are far outweighed by the benefits of the class action procedure, including but not limited to providing claimants with a suitable method for the redress of their claims.

## TRADE AND COMMERCE

34.    The activities of Defendants and Co-Conspirators, were within the flow of, and were intended to, and did have a substantial effect on the commerce of Vitamin C and products containing Vitamin C in Massachusetts.

35.    Vitamin C (also known as ascorbic acid) is a water-soluble vitamin. Vitamin C plays an important role in the biosynthesis of collagen in skin and of connective tissue, bones and teeth.  It is believed to enhance the functioning of the immune system by acting as an antioxidant.

36.    The manufacture of Vitamin C is a multi-million dollar a year industry worldwide.  The global market for Vitamin C is over $500 million per year. Approximately 55% of global Vitamin C consumption is for pharmaceutical-related uses, 35% is for food and beverage uses, and the remaining 10% is for the feed industry. The United States market for Vitamin C exceeds $100 million per year.  The conspiracy here involving Vitamin C has thus affected millions of dollars worth of commerce in products found in nearly every American household.

37.    Defendants manufacturer Vitamin C for bulk sales to customers. Defendants sell Vitamin C to food and pharmaceutical distributions and manufacturers in the United States for human consumption.  The Vitamin C manufactured by Defendants are commonly used in the United States as an ingredient in food and beverage products

and the production of vitamins packaged for consumer use under major brand names. Defendants also sell Vitamin C to manufacturers and users of animal feed and animal nutrition products. Each of the Defendants produces in excess of 15,000 metric tons of Vitamin C annually.

38.    During the period described in this Complaint, the international market for Vitamin C was dominated by Defendants. The Defendants' Vitamin C currently account for over 60 percent of the global Vitamin C market. Chinese manufacturers, like the Defendants, enjoy a number of competitive advantages relative to manufacturers in other nations, largely caused by Chinese labor conditions and China's currency exchange rate policy. Chinese foreign exchange/currency policy involves the employment of a fixed currency exchange rate which significantly undervalues the Yuan as opposed to other world currencies, making Chinese exports – including those of Vitamin C – to the United States artificially less expensive than those of the competitors to Chinese companies.

### Chinese Participation in the Vitamin C Market

39.    China began producing and exporting Vitamin C in the late 1950s. In 1969, Chinese scientists developed a two-stage fermentation process to manufacture Vitamin C, which resulted in a significant cost advantage compared to European producers. The technology began to be commercially employed in China in the 1980s.

40.    In the early period of the manufacture of Vitamin C by Chinese manufacturers, China had a reputation for poor product quality. This is no longer the case. Chinese manufacturers are now able to supply a full range of Vitamin C products, which are sold at premium prices. The great majority of sales of Vitamin C are of bulk ascorbic acid.

11

41.    In the early 1990s, the worldwide Vitamin C market was dominated by a number of European manufacturers – F. Hoffmann La Roche, Ltd. ("Roche"), Merck KgaA ("Merck"), and BASF AG ("BASF") – and the Japanese company Takeda Chemical Industries, Ltd. ("Takeda"). During the period 1990 to 1995, these companies engaged in their own conspiracy to suppress competition and fix prices for Vitamin C (the "First Vitamin C Conspiracy"). This conspiracy addressed in the *In re Vitamins Antitrust Litigation* and has resulted in final settlements and judgments with these companies for the benefit of a certified class of vitamin purchasers.

42.    During the 1990s competition from manufacturers of Vitamin C in China undermined the First Vitamin C Conspiracy until it reportedly disbanded in late 1995.

43.    During 1995, thirteen Chinese manufacturers of Vitamin C reportedly met and agreed to form their own cartel to limit production of Vitamin C and stabilize prices. This attempt to control the market reportedly failed.

44.    From the end of 1995, world Vitamin C prices slumped and were cut in half by early 1996. By 1997, the industry in China included as many as 22 competitors. One purpose of strong price competition by Chinese competitors during this period was to drive European competitors from the market.

45.    Through the end of the 1990s, the Chinese Vitamin C industry went through a period of consolidation, resulting in the industry consisting of the four manufacturers defendants in this case, Hebei Welcome, Jiangsu Jiangshan, Northeast Pharmaceutical, and Weisheng (the "Defendant Manufacturers").

A. Violations of Antitrust Laws

46.    In 2001, the price of Vitamin C remained relatively low. By that time,

12

Takeda had withdrawn from the market and sold its manufacturing capacity to BASF. European competitors Merck and Roche also indicated their intention to withdraw from the market. In addition, BASF announced that it would halt its new production line in Takeda, Japan. By the end of 2001, with the exception of Roche and BASF, all major Vitamin C competitors outside China were either bought up by other companies or simply dropped out of the business.

47.    By 2001, Defendants had captured approximately 60 percent of the worldwide market for Vitamin C. Defendants currently control 82 thousand metric tons — or approximately 68 percent of the worldwide production capacity for Vitamin C.

48.    The Defendants dominance in the market allowed them, starting in or around December 2001, to formed a cartel to control prices and the volume of exports for Vitamin C. At a meeting of the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China (the "Association") in December 2001, Defendants and the Association successfully reached an agreement for Chinese manufacturers of Vitamin C in which they agreed to control export quantities and achieve stable and enhanced price goals. The cartel members agreed to restrict their exports of Vitamin C in order to create a shortage of supply in the international market. The cartel members agreed to "restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically." The agreements of the cartel members were facilitated by the efforts of their trade association. Thus began their ongoing combination and conspiracy to suppress competition by fixing the price and controlling export sale volumes of Vitamin C offered for sale to customers in the United States and elsewhere (the "Second Vitamin C Conspiracy").

49.     The formation of the cartel and the effect of the agreements reached in December 2001 that comprised the Second Vitamin C Conspiracy quickly raised the market price for Vitamin C. For example, the price of Vitamin C in the United States rose from approximately $2.50 per kilogram in December 2001 to as high as $7 per kilogram during December 2002. Defendant China Pharmaceutical reported its 2003 annual report that average prices during 2002 rose from $3.20 per kilogram to $5.90 per kilogram, an increase of 84 percent. China Pharmaceutical also reported gross profit margins for its Vitamin C production of 60.2 percent in 2002, and increase of 28.1 percent.

50.     During the period of the Second Vitamin C Conspiracy, Defendants and their co-conspirators have participated in meetings and conversations in China and elsewhere in which the prices, volume of sales and exports to the United States, were discussed and agreed upon. These meetings have also been coordinated with trade association meetings for associations in which defendants are members.

51.     At the above-described meetings and during the period of conspiracy, defendants and others agreed to and did eliminate, suppress, and limit competition, including by:

        (a)     discussing the production volumes and prices of Vitamin C for export to the United States and elsewhere;

        (b)     agreeing to control the supply of Vitamin C for export to the United States and elsewhere;

        (c)     agreeing to increase and maintain price of Vitamin C in the United States and elsewhere; and

14

    (d)    agreeing to control the worldwide market for Vitamin C.

50.    During the period of the cartel, executives from the defendant have also warned each other against the adverse effects of the past price wars in Vitamin C.

51.    Defendants' illegal concerted conduct has been facilitated by their concentrated control over sales of Vitamin C. Together, defendants' sales constitute approximately 60 percent of all Vitamin C sales in the world and virtually 100 percent of the manufacturers who can produce Vitamin C for a cost below $4.50 to $5 per kilogram.

52.    Although non-cartel members BASF and DSM (which acquired the interest of Roche) control 30 to 40 percent of the worldwide market for Vitamin C, the cartel has been successful because the European manufacturers have higher manufacturing costs for Vitamin C than Chinese manufacturers which sets a floor below which the European manufacturers cannot compete. Defendants understand that price levels may be stabilized at $6 per kilogram or higher - a price twice as high as 2004 prices - because the European manufacturers face costs of production of $4.5 to over $5 per kilogram. Further, as the cartel has taken steps to restrain production and increase prices, European competitors have shown that they would follow price increases rather than undercut the new cartel price levels.

53.    Following the collusive price increases achieved in 2002, during 2003, the combination of supply restrictions by the cartel and unanticipated increases in world demand for Vitamin C, attributable in part to the outbreak of SARS in the Spring and Summer of 2003, allowed the cartel to achieve remarkable price increases. Prices jumped to as high as $15 per kilogram in April 2003.

54.    By approximately the third quarter of 2003, although prices remained at

super competitive levels, cartel members began opportunistically reducing prices to obtain increased sales in the enormously profitable market. Spikes in demand for Vitamin C increased the temptation among cartel members to undercut each other's prices in order to grab super-normal profits that still were substantially above competitive prices. Labeled a "price war" by the industry, the competition actually reflected price reductions at levels above collusively arranged prices.

55.     To address the price cutting, the Association called an "emergency meeting" in late November or early December 2003, which was attended by representatives of each of the defendants. The Association discussed with defendants at the meeting how they would rationalize the market and restrain and limit the production levels of Vitamin C to increase prices.

56.     In December 2003, defendants and their representatives, together with members of the Association, also met at the annual China Exhibition of World Pharmaceutical Ingredients. At this exhibition, defendants and the Association again met and devised plans to rationalize the market and to limit production levels and increase prices. The Association also warned defendants that it was impossible for any of them to monopolize the market to the detriment of the others.

57.     The emergency meeting called by the Association and other efforts by cartel members were successful. Prices for Vitamin C in December 2003 increased from a low of $4.20 per kilogram at the beginning of the month over $9 per kilogram by the end of the month.

58.     In June of 2004, in reaction to price reductions from their highs in December 2003, defendants agreed to also shut down production for equipment

maintenance. Defendants have also agreed on export volumes to the United States. These supply restrictions again have had the result of stabilizing prices.

59.    Despite some price decreases in 2004, the collusive arrangements of the cartel have continued to maintain prices well above those of a competitive market.

60.    The cartel established by defendants and their co-conspirators continues its illegal conduct today.

61.    During the Second Vitamin C Conspiracy, Defendants sold and shipped substantial quantities of Vitamin C for use an ingredient in food and beverage products and for use in the production of vitamins packaged for consumers use and animal feeds. The businesses to whom the Defendants sold their Vitamin C incorporated the Vitamin C into other products including, but not limited to, food, beverages, and vitamins, and then resold those goods to consumers and businesses in Massachusetts and elsewhere.

62.    The contract, combination, and conspiracy consists, upon information and belief, of a continuing agreement, understanding, and concert of action between and among Defendants and their co-conspirators, the substantial terms of which were and are to fix, stabilize, and maintain prices, and to coordinate price increases for the sale of Vitamin C and to control the supply of Vitamin C in Massachusetts and elsewhere. By imposing restrictive agreements on others, Defendants have engaged in unfair and deceptive acts and practices. They include but are not limited to direct involvement and control of unfair and deceptive competition. They have entered into unfair and deceptive combinations of capital, skill and acts with others for the purpose and with the intent and effect of creating and carrying out unfair and deceptive restrictions in trade and

17

commerce; increasing the price and limiting and reducing the supply of Vitamin C, and

restraining trade and preventing competition in the relevant market.

63. The acts in furtherance of the conspiracy by Defendants have included, on

information and belief, the following wrongful conduct and horizontal agreements:

    a. participating in meetings and conversations on a periodic basis since at least December 2001, in which defendants and their co-conspirators, discussed and agreed to fix, raise, stabilize, and maintain the prices for Vitamin C;

    b. participating in meetings and conversations, on a periodic basis since at least December 2001, in which defendants and their co-conspirators discussed and agreed to control and restrict export quantities of Vitamin C from China;

    c. facilitating, effectuating, implementing, monitoring, and concealing the contract, combination, and conspiracy to raise the prices of Vitamin C sold; and

    d. selling Vitamin C to customers throughout the United States at artificially inflated and non-competitive prices.

64. For the purposes of formulating and effectuating the aforesaid contract,

combination, and conspiracy, defendants and their co-conspirators did those things that

they conspired to do.


## IMPERMISSIBLE MARKET EFFECTS UNDER M.G.L. c. 93A

65. The contract, combination, and conspiracy alleged herein had the

following effects, among others:

    a. Prices paid by Plaintiff and other Class Members for Vitamin C were fixed, raised, maintained, and stabilized at artificially high and noncompetitive levels;

    b. Indirect purchasers of Vitamin C were deprived of the benefits of free and open competition; and

    c. Competition between and among Defendants and their co-

conspirators in the sale of Vitamin C was unreasonably restrained.

66.      None of Defendants are entitled to a demand letter under Massachusetts General Laws, Chapter 93A. None of Defendants has a place of business or assets in Massachusetts.

67.      As a result, Plaintiff and members of the Class have been injured in their business and property in that they paid more for products containing Vitamin C than they otherwise would have paid in the absence of Defendants' unlawful contract, combination, and conspiracy.

### FRAUDULENT CONCEALMENT

68.      Plaintiff incorporates by this reference each of the preceding paragraphs. Plaintiff and the members of the Class had no knowledge of the antitrust violations described above until recently. Plaintiff and the members of the Class could not have discovered the violations at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to fraudulently conceal such violations.

69.      Because the conspiracy was necessarily secret, purchasers of products containing Vitamin C, particularly Plaintiff and the members of the Class who did not even purchase Vitamin C directly from the defendants, were unaware that the prices of Vitamin C were agreed upon and fixed for the period of time alleged in this Complaint.

## COUNT I

### VIOLATION OF M.G.L. c. 93A

70.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1- 69 above.

71.    Beginning at least as early as December 2001 and continuing to the present, Defendants have engaged in unfair and deceptive acts and practices including those described herein and/or combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of Vitamin C products; and restraining trade and preventing competition in the relevant markets of Vitamin C products, thereby enabling Defendants to perpetuate their monopoly.

72.    As a direct and proximate result of Defendants' unlawful, unfair and deceptive acts and practices including combinations and contracts to restrain trade and monopolize the relevant markets, members of the class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

73.    Defendants' conduct in engaging in unfair and deceptive acts and practices including combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of Vitamin C; and restraining trade and preventing competition in the relevant market of Vitamin C, constitutes and was intended to constitute unfair and deceptive competition and unlawful and unfair and deceptive business acts and practices within the meaning of M.G.L. c. 93A.

74.    As a result of Defendants' violations of M.G.L. c. 93A, they have unjustly enriched themselves at the expense of the class members identified herein. Defendants' unjust enrichment continues to accrue as they continue to engage in unfair competition and unlawful business acts and practices.

75.    Defendants should be required pursuant to M.G.L. c. 93A and pursuant to

the rule of law *in Ciardi v. Hoffman-La Roche, Ltd.*, 2000 WL 59320(D.Mass. Feb. 7,
2000) to pay nominal statutory damages, costs and attorney fees to all the injured class
members identified herein.

### RELIEF REQUESTED

WHEREFORE, Plaintiff prays that this Court:

A.   Certify the Plaintiff Class pursuant to M.G.L. c. 93A;

B.   Declare that Defendants have engaged in unfair and deceptive acts,
practices and/or combinations of capital, skill and acts with others constituting a trust for
the purpose of creating or carrying out restrictions in trade or commerce, limiting and
reducing the production and increasing the price of merchandise or a commodity, and
preventing competition in manufacturing, making, transporting, sale or purchase of
merchandise, products, or a commodity.

C.   Find that the Defendants participated in unfair and deceptive competition
and unlawful and unfair and deceptive business acts and practices in violation of M.G.L.
c. 93A;

D.   Award Plaintiff and the members of the Class damages in an amount
deemed fair, reasonable, and just under the law, or in the alternative allow them to
recovery statutory damages under M.G.L. c. 93A, as well as the recovery of their
reasonable attorneys' fees and costs;

E.   Award Plaintiff and the members of the Class pre-judgment and post-
judgment interest on the above sums at the highest rate allowed by law; and

F.   Grant such other and further relief as this Court deems to be just and
equitable.

Dated: July 23, 2005                    Respectfully submitted,

William M. Straus
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA 02740
Telephone: 508-992-1270
BBO #483030


David Boies III
Kenneth G. Walsh
STRAUS & BOIES, LLP
2 Depot Plaza, 2nd Floor
Bedford Hills, NY 10507
Telephone: (914) 244-3200
Facsimile: (914) 244-3260

## CERTIFICATE OF SERVICE

I, William M. Straus, hereby certify that I have caused true copies of the Plaintiff's First Amended Complaint to be mailed upon counsel of record as indicated below on this 22nd day of July, 2005.

**Jiangsu Jiangshan Pharmaceutical Co.**
Attorney Richard Goldstein,
HellerEhrman, LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524

**Shijiazhuang Pharmaceutical Co.**
**Weisheng Pharmaceutical Co.**
**China Pharmaceutical Group**
Attorney William Gerald McElroy, Jr.
Zelle, Hoffmann, Voelbel, Mason & Gette LLP
950 Winter Street, Suite 1300
Waltham, MA 02451

William M. Straus